## Case No. 10,935.

### PENN v. KLYNE.

[1 Wash. C. C. 207; [1] 4 Dall. 402; Pet. C. C. 497.]

Circuit Court, D. Pennsylvania. Oct. Term, 1804.

PENNSYLVANIA PROPRIETARIES — OWNERSHIP OF SOIL AND SOVEREIGNTY — RULES AND CONCESSIONS—TENTHS—WARRANT AND SURVEY — CONSIDERATION—EJECTMENT.

1. The proprietaries of Pennsylvania, were the sole owners of the soil of the province, as well as of the sovereignty, in absolute fee simple; and were no otherwise trustees for the people, in respect to the soil, but as they rendered themselves so, by "the rules and concessions," which they made.

2. By these rules and concessions, they reserved to themselves, the right to appropriate one-tenth of the lands in the then province of Pennsylvania, to their own private use; and this appropriation was made by a particular warrant of appropriation, which was followed by a survey.

3. The land thus appropriated, could not be, afterwards, taken up by others, without a special agreement with the proprietaries; which might be on the "common terms," on which lands were then sold: or on other terms, by agreement. The title of any one, acquired previous to such an appropriation, could not be affected by any act of the proprietaries.

4. The divesting law of 1779, confirmed to the proprietaries, all their private lands, of which they were possessed, or entitled to, in 1779; and such as were known by the name of their tenths, or manors; and which had been surveyed, and returned into the land office, prior to July 4, 1776.

5. The manor of Springettsbury, was known as a manor, prior to 1776; and it was duly surveyed, and returned into the land office, before 4th July, 1776.

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

6. If a warrant be issued, to re-survey land, which was not legally surveyed; it will stand as an original warrant of survey.

[Cited in Goodlet v. Smithson, 5 Port. (Ala.) 245.]

7. A warrant and survey, and consideration paid, gives a title to land in Pennsylvania, sufficient to maintain an ejectment.

[Cited in Winter v. Jones, 10 Ga. 190.]

8. But, if the consideration be not paid, the warrant holder has only an equitable title, to compel a conveyance, on payment of the purchase money; and he cannot recover in ejectment, in this court, against the proprietaries, or those who hold under them; nor can he defend himself, in an action of ejectment brought against him by them.

[Cited in Winter v. Jones, 10 Ga. 190.]

This was an ejectment brought by the former proprietaries of Pennsylvania, to recover the tract of land in question, being part of the manor of Springettsbury. Springettsbury Manor was surveyed in the year 1722, under a warrant from the governor of Pennsylvania, for the use of the proprietary. The survey, however, was not returned into the land office, but into that of the council. Being supposed to be lost, another warrant issued in 1762, stating the loss, and directing a re-survey of the manor of Springettsbury; but directs the location of it specially. The survey was made, and duly returned into the land office, in the year 1768. This last survey comprehends a great part of the land surveyed in 1722, and a large body of land not included within that survey. But the land in question lies within both surveys. The defendant showed a complete title to a part of the land in question, and a warrant and survey for the balance, prior to the year 1762; but did not prove payment of the consideration money to the proprietaries. The defendant insisted that the survey of 1722 was void, as the governor had no authority to issue the warrant in 1722. That the survey of 1762 was void, being made as an original survey, though the warrant only authorized a re-survey; consequently, that the land in question was not part of a manor surveyed according to the terms of the divesting law; and was, therefore, confiscated by that law: not being within the exceptions of it. But, that if the plaintiff had a title, still, the defendant's was a better, being founded on a warrant and survey, which is a good legal title, in this state, against all the world; and, as to the consideration money, the jury, after such a lapse of time, might and ought to presume it paid.

2 [The title of the lessor of the plaintiff to the premises in dispute, was regularly deduced from the charter of Charles II. to William Penn,3 provided there was a manor called and known by the name of Springettsbury, duly surveyed and returned, according

to the terms and meaning of the act of November, 1779.

[The material facts, upon the controverted point, were these: At the time that Sir William Keith was governor of the province, the controversy between the proprietor and Lord Baltimore had arisen; and many persons from Maryland intruded upon the adjacent lands in Pennsylvania. Under the pressure of these intrusions, Sir William, on the 18th of June, 1722, issued a warrant to John French, Francis Worley and James Mitchell, in which he recited, "that the three nations of Indians on the north side of Susquehanna are much disturbed, and the peace of the colony in danger, by attempts to survey land on the south-west bank of the river, over against 'the Indian towns and settlements, without any right, or pretence of authority, so to do, from the proprietor, unto whom the lands unquestionably belong; that it is agreeable to treaty and usage to reserve a sufficient quantity of land, on the south-west side of the Susquehanna, within the proprietor's land, for accommodating the said Indians: and that the Indians had requested, at a treaty, held on the 15th and 16th instant, that a large tract of land, right against their towns on Susquehanna might be surveyed for the proprietor's use only; because, from his bounty and goodness, they would always be sure to obtain whatsoever was necessary and convenient for them, from time to time." Sir William's warrant then proceeded, that "by virtue of the powers wherewith he is entrusted for the preservation of his majesty's peace in this province, and with a due respect and regard to the proprietor's absolute title, and unquestionable rights, he directs and authorises, the persons named in the warrant, to cross and survey, mark and locate, 70,000 acres in the name and for the use of Springet Penn, Esq., which shall bear the name, and be called the manor, of Springettsbury: beginning upon the south-west bank, over against Conestogoe creek; thence W. S. W. 10 miles; thence N. W. by N. 12 miles; thence E. N. E. to the uppermost corner of a tract called Newberry; thence S. E. by S. along the head line of Newberry, to the southern corner tree of Newberry; thence down the side line of Newberry E. N. E. to the Susquehanna; and thence down the river side to the place of beginning: And to return the warrant to the governor and council of Pennsylvania." The survey being executed on the 19th and 20th of June, was returned to the council, on the 21st of June, 1722, according to the following boundaries: 'From a red oak, by a run's side, called Penn's run, marked S. P., W. S. W. 10 miles to a chesnut by a run's side called French's run, marked S. P.; thence N. W. by N. to a black oak marked S. P. 12 miles; thence E. N. E. to Sir Wm. Keith's western corner tree in the woods 8 miles; thence along the S. E. and N. E. lines of Sir Wm. Keith's tract called New-

---

2 [From 4 Dall. 402.]

3 The original charter was given in evidence upon the trial.

berry to the Susquehanna; and thence along the river side to the place of beginning; containing 75,520 acres."

[Sir William Keith having communicated these proceedings to the council, on the 2d of July, 1722, it was thereupon declared, that "so far as they concerned, or touched, with the proprietary affairs, they were not judged to lie before the board;" which acted as a council of state, and not as commissioners of property. Col. French (one of the surveyors who executed the warrant) then undertook to vindicate the conduct of Sir Wm. Keith to the council, stating that "the warrant specified his true reasons; and that it was, under all circumstances, the only effectual measure, for quieting the minds of the Indians, and preserving the public peace." The warrant and survey, however, could not be returned into the land-office at that time; for, it was said, that the land-office continued shut from the death of W. Penn in 1718, until the arrival of T. Penn in 1732: nor does it appear, that they were ever filed in the land-office, at any subsequent period. In order to resist the Maryland intrusions, encouragement was offered by Sir W. Keith, and accepted, by a number of Germans, for forming settlements on the tract, which had been thus surveyed; and in October, 1736, Thomas Penn having purchased the Indian claim to the land, empowered Samuel Blunston to grant licences for 12,000 acres (which was sufficient to satisfy the rights of those who had settled, perhaps, fifty in number) within the tract of land "commonly called the manor of Springettsbury," under the invitations of the governor. But in addition to such settlers, not only the population of the tract in dispute, but of the neighbouring country, rapidly increased. The controversy with Maryland was finally settled in the year 1762, at which time James Hamilton was governor of the province; and, on the 21st of May of that year, he issued a warrant of re-survey, in which it was set forth, "that in pursuance of the primitive regulations, for laying out lands in the province, W. Penn had issued a warrant, dated the 1st of September, 1700, to Edward Pennington, the surveyor general, to survey for the proprietor, 500 acres of every township of 5,000 acres; and, generally, the proprietary one tenth of all lands laid out, and to be laid out; that like warrants had been issued by the successive proprietaries to every succeeding surveyor general; that the tracts surveyed, however, are far short of the due proportions of the proprietary; that, therefore, by order of the then commissioners of property, and in virtue of the general warrant aforesaid to the then surveyor general, there was surveyed for the use of the proprietor on the 19th and 20th of June, 1722, a certain tract of land, situate on the west side of the river Susquehanna, then in the county of Chester, afterwards of Lancaster, and now of York, containing about 70,000 acres,

called and now well known by the name of the manor of Springettsbury; that sundry Germans and others afterwards seated themselves by leave of the proprietor on divers parts of the said manor, but confirmation of their titles was delayed on account of the Indian claim; that on the 11th of October, 1736, the Indians released their claim, when (on the 30th of October, 1736) a licence was given to each settler (the whole grant computed at 12,000 acres) promising patents, after surveys should be made; that the survey of the said tract of land is either lost, or mislaid; but that from the well known settlements and improvements made by the said licenced settlers therein, and the many surveys made round the said manor, and other proofs and circumstances, it appears that the said tract is bounded E. by the Susquehanna, W. by a north and south line west of the late dwelling plantation of Christian Elstor, called Oyster, a licenced settler, N. by a line nearly east and west distant about three miles north of the present great roads, leading from Wright's ferry through York-Town by the said Christian Oyster's plantation to Monockassy; S. by a line near east and west distant about three miles south of the great road aforesaid; that divers of the said tracts and settlements within the said manor, have been surveyed and confirmed by patents, and many that have been surveyed remain to be confirmed by patents, for which the settlers have applied; that the proprietor is desirous, that a complete draft, or map, and return of survey of the said manor shall be replaced and remain for their and his use, in the surveyor general's office, and also in the secretary's office; that by special order and direction a survey for the proprietor's use was made by Thomas Cookson, deputy surveyor (in 1741) of a tract on both sides of the Codorus, within the said manor, for the scite of a town, whereon York-Town has since been laid out and built, but no return of that survey being made, the premises were re-surveyed by George Stevenson, deputy surveyor (in December, 1752) and found to contain 436½ acres." After this recital the warrant directed the surveyor general "to re-survey the said tract, for the proprietor's use, as part of his one-tenth, in order that the bounds and lines thereof may be certainly known and ascertained." On the 13th of May, 1768, the governor's secretary, by letter, urged the surveyor general to make a survey and return of the outline of the manor at least; the survey was accordingly executed on the 12th and 30th of June; and the plat was returned into the land-office, and, also, into the secretary's office on the 12th of July, 1768, containing 64,520 acres; a part of the original tract of 70,000 acres having been cut off, under the agreement between Penn and Baltimore, to satisfy the claims of Maryland settlers.

[On the trial of the cause, evidence was given on each side, to maintain the opposite

positions, respecting the existence or non-existence of the manor of Springettsbury, from public instruments; from the sense expressed by the proprietaries, before the Revolution, in their warrants and patents; from the sense expressed by the warrants and patents issued since the Revolution; from the practice of the land-office; and from the current of public opinion.

[The general ground taken by the plaintiff's counsel (E. Tilghman and Lewis & Rawle) was, 1st. That the land mentioned in the declaration is a part of a tract called, or known by the name of a proprietary manor. 2d. That it was a proprietary manor duly surveyed, within the true intent and meaning of the act of the general assembly. And, 3d. That the survey was duly made and returned before the 4th of July, 1776.

[The defendant's counsel (McKean, Atty. Gen., and Hopkins & Dallas) contended, 1st. That Sir Wm. Keith's warrant being issued in 1722, without authority, all proceedings on it were absolutely void; and that neither the warrant, nor survey, had ever been returned into the land-office. 2d. That Governor Hamilton's warrant was issued in 1762, to re-survey a manor, which had never been legally surveyed, and was, in that respect, to be regarded as a superstructure without a foundation. 3d. That the recitals of Governor Hamilton's warrant are not founded in fact; and that considering the survey, in pursuance of it, as an original survey, it was void, as against compact, law, and justice, that the proprietor should assume for a manor, land, that had been previously located and settled by individuals.] 4

WASHINGTON, Circuit Justice (charging jury). In this cause there are two questions. First; has the lessor of the plaintiff shown a title to the lands in question? If he has, secondly, has the defendant shown a better right?

1. The lessors of the plaintiff, or those under whom they claim, were once the sole owners and proprietaries, not only of the government, but of the soil of Pennsylvania; not in a political, but in their private capacities; not as trustees for the people, as to the whole, or any part of the soil, but in absolute fee simple for their individual uses. This right was no otherwise weakened by concessions or agreements, made by the first William Penn, or his descendants; than to render them trustees for such individuals, as should acquire equitable rights to particular portions of land, under general or special promises, rules, and regulations, which the proprietaries may, from time to time, have entered into, and established. The right of the proprietaries to appropriate to their own use, particular portions of the waste lands within the province; was not derived from, or founded upon any such rules or concessions; but

4 [From 4 Dall. 402.]

flowed from their original chartered rights, which vested in them a perfect title to the whole of the soil. But, since it was their interest to encourage the population and settlement of the province, they erected an office, and laid down certain rules for its government, and the government of those who might desire to acquire rights to the unappropriated lands within the province; reserving to themselves a right to appropriate one-tenth of the whole to themselves, for their private individual use.

From hence the following principles resulted. That all persons complying with the terms thus held out, acquired a right to the portion of land thus appropriated. not only against other individuals, who might thereafter attempt to appropriate the same tract, but even against the proprietaries themselves; unless they had previously, and by some act of notoriety, evidenced their intention to withdraw such land from the general mass, and to appropriate it to their private use. As a necessary consequence of this principle, whenever such was their intention, it was made known by a warrant of appropriation, and a survey to mark out, and locate the ground thus withdrawn. These steps gave notice to all the world, that no right to the land thus laid off for the proprietaries, could be acquired by other individuals, without a special agreement with the proprietaries or their agents; and this might or might not be upon the common terms, as the proprietaries might choose. But, if before such special appropriation by the proprietaries, an individual had, in compliance with the office rules, obtained a warrant, and made an appropriation of a tract of land, lying within the boundaries of the tract thus laid off for the proprietaries; such prior appropriation of the particular tract, could no otherwise affect the right of the proprietaries, than in relation to such particular tract. Their right to the residue would remain as perfect, as if such interference had not taken place. On this ground, the right of the first proprietary stood at the time of his death, and so continued to exist in his legal representatives, until the year 1779; when a law of the state was made, divesting the proprietaries of all their estate. right, and title, in or to the soil of Pennsylvania, and vesting the same in the commonwealth. But this law excepted certain portions of land, the right to which is confirmed and established in the proprietaries for ever. The lands thus confirmed, are all their private lands, whereof they were possessed, or to which they were entitled in 1779. and such as were known by the name of their tenths and manors, which had been surveyed and returned into the land office before the 4th of July, 1776.

The lessors of the plaintiff, who most undoubtedly are entitled to all the rights of the proprietaries, are now compelled to date their title from this law; and therefore it is necessary for them to show, that the land in ques-

tion, is part of a tract called and known by the name of a proprietary tenth or manor, which was duly surveyed, and returned into the land office, on or before the 4th of July, 1776. They are to prove: 1. That the tract of which the land in question is a part, was, in 1779, called and known by the name of a proprietary tenth, or manor.

The words of the law are peculiar. As to their private rights, they must be such, whereof they were, in 1779, possessed, or to which they were entitled. But as to the tenths, or manors, it is sufficient if they were known by that name, and had been surveyed and returned before the 4th of July, 1776. These expressions respecting the manors, were rendered necessary, to avoid giving to the word manor a technical meaning. For there were no manors in Pennsylvania, in a legal acceptation of that word; but there were many tracts of land, appropriated to the separate use of the proprietaries, to which this name had been given.

The first inquiry, therefore, under this head, is, was the land in question, part of a tract called and known as a manor, on the 4th of July, 1776, or in 1779. To prove this fact, the licenses granted by Thomas Penn, to about fifty settlers in different parts of the first, as well as the second, survey, in all of which this is called the manor of Springetts-bury; are strongly relied upon to show; that even at that early period, it had acquired this name. The tenor of the warrants, afterwards granted for lands within this manor, varying from the terms of the common warrants; and this variance proved by many witnesses, as marking this for manor land, is also relied upon. In addition to these, the following circumstances are strongly insisted upon by the plaintiff's counsel.

The testimony of witnesses, to show that the west line of this manor, was always reputed to go considerably beyond York to Oyster's. The practice of the surveyors, and other public officers, whenever warrants were issued to survey lands in this manor. But even if this tract of land had never acquired the name of a manor, prior to 1768, the survey made of it in that year, as of a manor, is conclusive. From that period, it acquired by matter of record the name of a manor; and so it appears, by the evidence in the cause, it was called and known, if that evidence be believed.

Secondly. Was it duly surveyed, and returned into the land office, before 4th July, 1776? That it was surveyed in 1768, is admitted; but it is contended, that it was not duly surveyed. The argument of the defendant's counsel, on this point, is. that the survey was not duly made; because the land was surveyed in 1722. That this survey was void, because made without authority; the governor having no authority to issue the warrant. That it was not executed by the surveyor general, and was returned into the council of state's office, instead of the land office. Presuming these points to be established, it is then deduced from them, that the illegality of the survey of 1722, vitiates that of 1768; the former being considered as the foundation, and the latter as the superstructure. It is argued, that the survey of 1768, is executed under a warrant of re-survey in 1762; and consequently, that the repetition of an act, which has no validity, cannot make it valid. It is further contended, that the recital in the last warrant, of the loss of the first survey, is a mere pretence, since it was afterwards found; a fraud to enable the proprietaries to change the location, for the purpose of getting good, instead of bad lands.

Now, I confess, that I do not understand this kind of logic. [It is far too refined for the sober judgment of me, who have to decide.] [5] If the invalidity of the first survey. can have any effect upon the second, I should suppose it would establish it beyond all doubt; because if the first survey were good, and if the warrant of 1762, were merely an order to retrace the lines of that survey, the counsel might, with some plausibility at least, have argued, that the surveyor was bound to pursue the lines of that survey; and this might give colour to the observations, founded on the mistake of the public officers, as to the proper lines of the survey. But, if the first survey be unauthorized, and utterly void, then the second could not, in the nature of things, be a re-survey; whatever might be the language of the warrant on which it was founded. There is no magic in the word re-survey. If in fact there never was a former survey, there could not be a re-survey; and consequently, the survey of 1768 was an original survey, founded on a special warrant, marking out the lines and boundaries, by which the surveyor was bound to go; and such is the fact in this case. As to the imputation of fraud, I see nothing to support it. The proprietaries had no motive to practise it, since the lands included in the second survey, which were not within the first, being at that time unappropriated, (some few parcels excepted,) they had a perfect right to appropriate them without the aid of a fraud. Although the survey of 1722 is referred to, in the warrant of 1762, yet, the lines of the manor to be surveyed, under the second warrant, are specially described; and consequently, it is not a re-survey in fact, as to any lines not marked in the first survey. To the lines thus described, the surveyor was confined; and had he departed from them, the surveys, unless ratified by acceptance, would have been void, as against the proprietary who might have directed it to be made, conformable with the warrant. It is not denied, that the survey of 1768, is in conformity with the warrant. It was accepted as a valid survey, and I cannot see upon what ground the defendant, or any other person, can now say

---

[5] [From 4 Dall. 402.]

that it was void. Had not the proprietary a right to appropriate, to his private use, the land included within the survey of 1768, in part of the tenths which had always been reserved? And if the warrant and survey made this appropriation, what does it signify whether there was a prior survey or not, or whether it was good or bad? I admit, that if, previously to the warrant of 1762, third persons had acquired a right to parcels of this land, or had done so afterwards, and before the survey of 1768, but without notice of the warrant; the proprietary would have been bound to make them titles, upon their complying with the common terms; but this could not impeach the title of the proprietaries, to the residue of the land, comprehended within the lines of the survey.

Upon the whole, then, the court is of opinion, that this manor was duly surveyed; and it is admitted, that the survey was returned into the land office, before 4th July, 1776.

The next question is, has the defendant a better legal title, than that of the lessors of the plaintiff? He claims by a warrant dated in 1747, the title to which is regularly deduced to him, for ninety-five acres, part of the land in dispute. He has no patent; but yet, by the common law of this state, a warrant and survey, if the consideration be paid, gives a legal title against the proprietaries; as much so as if a patent had been granted. If the consideration be not paid; then the legal title is not out of the proprietaries; but still, the warrant holder has an equitable title, which he may render a legal one, by paying what is due to the proprietaries. No proof is given of payment by the defendant, or any one under whom he claims, but the jury are called upon to presume it from length of time.

In a case of this sort, there is no room for presumption. The very circumstance of the defendant appearing in court, without a patent, or without showing or pretending that a patent ever was granted, destroys the presumption, which length of time might otherwise have created. For, if he had paid the consideration money, he would, that moment, have been entitled to a patent. The one was a necessary consequence of the other. A man might, for a long time, forbear to call for this consummation of his title, from his inability to pay the consideration money; but that he should pay it, and not go on to perfect his title, is altogether improbable, and certainly not to be presumed. But, if the jury could presume any thing from length of time, yet that presumption may be repelled, and in this case there is strong evidence to repel it. The original grantee, in his deed to Shultz, in 1771, states, that it had not been paid; and such is the statement in the deed from Shultz's executor, in 1794, to Stamp, under whom the defendant claims. The defendant therefore has not a legal title, so as to enable him to succeed in this suit. But he has an equitable title, and may compel the lessors of

the plaintiff to make him a conveyance, upon his paying, or tendering, what is due to the plaintiff's lessors, with interest, costs, &c. And if the plaintiff's lessors should, on such payment or tender, refuse to make a conveyance, this court, sitting in equity, would compel them, at the expense of costs in that suit.

I understand, that in the courts of this state, the jury, in a cause of this kind, may make a special or conditional finding, in consequence of there being no courts of equity in Pennsylvania. But the reason not applying to this court, the verdict must be general.

Verdict for plaintiff.

[For a similar action see Penn v. Groff, Case No. 10,932.]